# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WESTWIND MANOR RESORT | ) Case No. 19-50026 (MI) |
| ASSOCIATION, INC., *et al.*,[1] | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**CREDITOR TRUSTEE'S MOTION FOR (I) APPROVAL OF PAYMENT OF FINAL AMOUNTS, (II) TERMINATION OF THE CREDITOR TRUST AND THE DISSOLUTION OF THE REMAINING DEBTORS, (III) DISCHARGE OF CREDITOR TRUSTEE, OVERSIGHT COMMITTEE, AND CUSTOM GOLF BOARD, (IV) ENTRY OF FINAL DECREE CLOSING REMAINING CHAPTER 11 CASES, AND (V) GRANTING RELATED RELIEF**

---

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 12, 2026 AT 11:30 A.M. IN COURTROOM 404, FOURTH FLOOR, 515 RUSK, HOUSTON, TEXAS 77002. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE. THE MEETING CODE IS "JUDGEISGUR". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE ISGUR'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Westwind Manor Resort Association, Inc. (7533); Warrior ATV Golf, LLC (3420); Warrior Acquisitions, LLC (9919); Warrior Golf Development, LLC (5741); Warrior Golf Management, LLC (7882); Warrior Golf Assets, LLC (1639); Warrior Golf Venture, LLC (7752); Warrior Premium Properties, LLC (0220); Warrior Golf, LLC (4207); Warrior Custom Golf, Inc. (2941); Warrior Golf Equities, LLC (9803); Warrior Golf Capital, LLC (5713); Warrior Golf Resources, LLC (6619); Warrior Golf Legends, LLC (3099); Warrior Golf Holdings, LLC (2892); and Warrior Capital Management, LLC (8233).

Force 10 Agency Services LLC, in its capacity as the Creditor Trustee (the "**Creditor Trustee**") of the Creditor Trust (the "**Creditor Trust**") pursuant to the Plan (defined below),[2] as confirmed by the Confirmation Order (defined below), for the above-referenced jointly administered cases of Westwind Manor Resort Association, Inc., *et al.* (the "**Debtors**"), hereby moves (this "**Motion**") for entry of an order, substantially in the form attached hereto (the "**Proposed Order**"), in accordance with the Plan, Confirmation Order, and Creditor Trust Agreement (each as defined below) (i) approving the final payment of the Final Amounts (defined below) by the Creditor Trust, (ii) authorizing the termination of the Creditor Trust and the dissolution and wind down of the Reorganized Debtors and Lead Debtor (each as defined below), (iii) discharging the Creditor Trustee, Oversight Committee, and Custom Golf Board of further obligations under the Plan Documents, (iv) entering the final decree with respect to the remaining Reorganized Debtor Cases (defined below) and Lead Case (defined below), and (v) granting related relief. In support of the Motion, the Creditor Trust respectfully states as follows:

## PRELIMINARY STATEMENT

1. Since the August 5, 2020 effective date of the Plan (the "**Effective Date**"), the Creditor Trust has been active in liquidating the Creditor Trust Assets, which has involved the sale of numerous golf courses and related real and personal property (collectively, the "**Remaining Property**"), the reorganization and eventual wind down of the Debtors' golf equipment manufacturing and sales business, and the pursuit of numerous litigation claims against the Debtors' former insiders and other parties and professionals who aided the Debtors in perpetrating their fraudulent investment raising scheme. As a result of the Creditor Trust's efforts, which are further detailed below, the Creditor Trust has generated approximately

---

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Plan and Confirmation Order, as applicable.

$11,242,000 in gross proceeds from the sale of Trust Assets, as more fully set forth in the Draft Final Accounting and Budget (defined below), attached hereto as **Exhibit A**.  As of the date hereof, all available Creditor Trust Assets have been monetized or otherwise disposed of, and the Creditor Trust's only remaining liquid assets is the net cash on hand from the sale of the Trust Assets and the net income from the wind-down of the Debtors' golf course and golf club manufacturing operations.  The Trust also holds the equity interests in the Lead and Reorganized Debtors (which no longer have value as a result of the Creditor Trust's monetization efforts).

2.     Notwithstanding the Creditor Trust's significant efforts to maximize the value of the Trust Assets, the value generated by the Trust Assets is insufficient to result in a distribution to the Holders of Claims in Classes 4 (General Unsecured Claims), Class 5 (Investment Claims), and Class 6 (Convertible Note Claims) of the Plan. As of the Effective Date, there remained approximately $1,126,000 owing under the DIP Facility, which was converted to the Exit Facility on the Effective Date, in addition to approximately $1,300,000 in prepetition secured claims under the Plan, which amounts were required to be, and have subsequently been, satisfied from the Trust Assets prior to any distribution to any Allowed unsecured claims. Additionally, there remained substantial unpaid Professional Fee Claims (defined below), as of the Effective Date, in the approximate amount of $6,760,000, as further discussed below. Pursuant to the Confirmation Order, certain Holders of Professional Fee Claims agreed to defer payment of their Professional Fee Claims until a later date by the Creditor Trust, while certain other Holders of Professional Fee Claims agreed to accept discounted payments in satisfaction of their Professional Fee Claims. The Confirmation Order provided that Allowed but unsatisfied Professional Fee Claims would be paid by the Creditor Trust, prior to the payment of other Allowed Claims, including those in Classes 4, 5, and 6 of the Plan.

3.      The COVID 19 pandemic was in its early stages as the Debtors prepared to emerge from their chapter 11 cases in the spring and summer of 2020. Notwithstanding efforts to sell the remaining golf courses during the chapter 11 cases, the challenging business environment created by COVID and the restrictions on indoor dining and events made it difficult to sell the remaining courses. The intention was to sell certain of the Remaining Property and use the proceeds to satisfy (i) the obligations under the DIP Facility, (ii) pre-petition secured claims encumbering the applicable golf courses, and (iii) then use the remaining proceeds to partially satisfy Allowed Professional Fee Claims needed to emerge from chapter 11, before selling the last of the Remaining Property (including any remaining golf courses) so that the Debtors could qualify for critical PPP loans. The DIP Lender and estate professionals agreed to push ahead to confirmation and have the Plan go effective to facilitate receiving the PPP loans. The DIP Loan converted to the Exit Facility and certain estate professionals negotiated discounted payment of their Allowed Professional Fee Claims. Other estate professionals agreed to ratable payment over time. Immediately upon the Effective Date, the Reorganized Debtors applied for and received two PPP loans – one for the golf course business and the other for the golf club manufacturing business.

4.      By virtue of the agreements reached by the Creditor Trust and the Holders of Professional Fee Claims, as well as post-Effective Date payments of Allowed Professional Fee Claims, as of the date hereof, $2,198,686 in Allowed Professional Fee Claims remain unpaid to four separate Holders of Professional Fee Claims. This amount significantly exceeds the remaining assets of the Creditor Trust after payment of the remaining Trust Expenses (as defined below). Because the outstanding Allowed Professional Fee Claims exceed the remaining assets of the Creditor Trust and such Allowed Professional Fee Claims are required to be paid prior to

the payment of Claims in Classes 4, 5, and 6 of the Plan, the Creditor Trust will be unable to make distributions on account of Claims in Classes 4, 5, and 6.

5.     Accordingly, the Creditor Trust files this Motion to make the final distribution of the Trust Assets on account of the Trust Expenses and the Remaining Professional Fee Claims, wind down the Creditor Trust and Lead and Reorganized Debtors, discharge the Creditor Trustee, Oversight Committee, and Custom Golf Board of further obligations under the Plan Documents, and close the Debtors' remaining cases.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

**A.     General Procedural Background**

8.     On March 4, 2019, April 4, 2019, and May 30, 2019, an aggregate of 16 entities each filed a petition in the Bankruptcy Court seeking relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").

9.     On March 19, 2019, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**") in the Chapter 11 Cases pursuant to Section 1102(a) of the Bankruptcy Code.

10.    A detailed description of the Debtors' business and the facts precipitating the filing of the Chapter 11 Cases are set forth in the *Declaration of Jeremy Rosenthal in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 9] (the "**First Day Declaration**"). Those facts are incorporated herein by reference.

11.     On June 2, 2019, the Court entered that certain *Second Amended Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 294] (the "**Joint Administration Order**"), which, *inter alia*, directed that the Chapter 11 Cases be jointly administered under the Chapter 11 Case of the Lead Debtor, Case No. 19-50026, *In re Westwind Manor resort Association Inc.* (the "**Lead Case**"). The Chapter 11 Cases other than the Lead Case and the cases of the Reorganized Debtors, as such term is defined below (collectively, the "**Affiliate Cases**" for the "**Affiliated Debtors**") are as follows:

| Affiliated Reorganized Debtor | Affiliated Case |
|---|---|
| Warrior ATV Golf, LLC | 19-50033 |
| Warrior Golf Development, LLC | 19-50029 |
| Warrior Golf Management, LLC | 19-50032 |
| Warrior Golf Assets, LLC | 19-50030 |
| Warrior Golf Venture, LLC | 19-50031 |
| Warrior Premium Properties, LLC | 19-50034 |
| Warrior Golf Equities, LLC | 19-31953 |
| Warrior Golf Capital, LLC | 19-31954 |
| Warrior Golf Resources, LLC | 19-31955 |
| Warrior Golf Legends, LLC | 19-31957 |
| Warrior Golf Holdings, LLC | 19-31958 |
| Warrior Capital Management, LLC | 19-32951 |

In addition, the Joint Administration Order also directed the joint administration of the Chapter 11 Cases of three additional affiliated Debtors (collectively, the "**Reorganized Debtor Cases**" and the "**Reorganized Debtors**"):

| Reorganized Debtor | Reorganized Debtor Case |
|---|---|
| Warrior Acquisitions, LLC | 19-50028 |
| Warrior Golf, LLC | 19-50035 |
| Warrior Custom Golf, Inc. | 19-50027 |

12.     On March 18, 2020, the Bankruptcy Court entered the Order approving the Disclosure Statement at Docket No. 783 (the "**Disclosure Statement and Solicitation Order**"), *inter alia*, approving of the *Debtors' First Amended Disclosure Statement for the Joint Plan of*

*Reorganization Proposed by the Debtors and the Committee Pursuant to Section 1125 of the Bankruptcy Code* [Docket No. 786] (the "**Disclosure Statement**"). The Disclosure Statement is in reference to the *Debtors' and Committee's First Amended Joint Plan of Reorganization* [Docket No. 787] (collectively with all amendments, supplements, and exhibits thereto, the "**Plan**"). The Disclosure Statement and Plan are incorporated herein by reference.

13.     On May 18, 2020, the Debtors filed their *Plan Supplement for the Debtors' and Committee's First Amended Joint Plan of Reorganization* [Docket No. 903] (the "**Plan Supplement**").

14.     On June 15, 2020, the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Chapter 11 Plan as of March 22, 2020* [Docket No. 999] confirming the Plan (the "**Confirmation Order**" and, together with the Plan and Plan Supplement, the "**Plan Documents**"). Among other things, the Confirmation Order confirmed the Plan and implemented certain modifications thereto (discussed further below, as applicable).

15.     On July 31, 2020, the Court entered its *Order Granting Debtors' Emergency Motion for Entry of an Order in Aid of the Debtors' Effective Date* [Docket No. 1077] (the "**Order in Aid**"). The Order in Aid implemented certain nonmaterial modifications to the Plan, including modifications of defined terms: Op.Co, Prop.Co. Oversight Committee, and Custom Golf Board.

16.     On August 5, 2020, the Debtors filed that certain *Notice of: Confirmation of Plan, Permanent Injunction, Various Deadlines, Effective Date; and Deadline for Filing Administrative Claims and Claims Arising from the Rejection of Executory Contracts and Unexpired Leases* [Docket No. 1087], setting forth that, *inter alia*, the Effective Date (as such term is defined in the Plan) occurred on August 5, 2020. On that same date, the *Creditor Trust*

*Agreement* was executed among the Debtors and the Creditor Trustee, a copy of which appears as Exhibit A in the Plan Supplement (the "**Creditor Trust Agreement**"), and the Debtors entered into the Exit Facility. *See* Docket No. 1086.

17.    On March 30, 2021, the Court entered its *Final Decree Granting Creditor Trustee's Motion for Entry of a Final Decree Closing Certain of the Chapter 11 Ca[s]es* [Docket No. 1171] (the "**Decree Closing Certain Affiliate Cases**"), closing the Affiliate Cases and leaving open (pending further order of the Court) the Lead Case and Reorganized Debtor Cases.

**B.    The Debtors' Businesses, the Plan, and the Creation of the Creditor Trust**

18.    The Disclosure Statement details the Debtors' history, both pre- and post-petition. In summary, the Debtors had two primary business lines. The Debtors were founded in 1998 as Warrior Custom Golf, Inc. ("**WCG**") and focused on direct mail and TV advertising for the sale of custom designed golf clubs and other golf gear. The Debtors then expanded into owning and operating golf courses throughout the United States. The Debtors utilized the sales team at WCG to generate leads to sell membership interests in limited liability companies that owned golf courses and land. The pre-petition Debtors used the proceeds of these sales to pursue golf course concepts (such as an ATV based golf course) and to purchase and operate distressed golf courses in suburban and rural areas. The Debtors also used the proceeds from the sale of membership interests to fund improper sales commissions, make improper distributions, fund corporate overhead, and fund operating losses.

19.    As further described in the Disclosure Statement, the Debtors' poor business practices and fraud consumed the Debtors' assets and precipitated the Chapter 11 filings. Following various investigations and the removal of insiders, the Debtors commenced these Chapter 11 Cases "to rectify what appears to have been a decades long fraud involving securities

4868-7131-2577.7 75805.001                                8

offerings, through the use of a large internal boiler room salesforce, to over 2,000 individuals, that ultimately raised in excess of $110 Million, to support multi-million-dollar distributions to insiders, and the purchase of golf courses that had no opportunity to become profitable."[3]

20.     Among other things, the Plan created the Creditor Trust, substantively consolidated the Debtors, and vested the Creditor Trust Assets in the Creditor Trust through the Reorganized Debtors for the benefit of the beneficiaries of the Creditor Trust. The Creditor Trust Assets included, *inter alia*, (i) the equity in the Debtors' golf club manufacturing business (*i.e.* Reorganized Debtor WCG), (ii) the equity in the Debtors' golf course ownership business through Prop.Co. (*i.e.* Reorganized Debtor Warrior Golf, LLC) which, under the Plan, held all of the Debtors' interests in the Remaining Properties, (iii) the Trust Contribution Funds, and (iv) various claims and causes of action (*i.e.* the Assigned Estate Claims). *See* Plan, at Art. 1.02(50).

21.     Article 5.15 of the Plan provides that, "The Creditor Trust shall be established pursuant to this Plan and become effective for the benefit of the Creditor Trust Beneficiaries on the Effective Date for the primary purpose of (a) pursuing the Assigned Estate Claims, (b) maximizing the value of and monetizing Reorganized Custom Golf's equity, (c) maximizing the value of and monetizing the Real Property and personal property held by Prop.Co., and (d) distributing the net proceeds of (a), (b) and (c) to the Creditor Trust Beneficiaries pursuant to this Plan and the Creditor Trust Agreement with no objective to continue or engage in the conduct of a trade or business."  Pursuant to the Plan, Order in Aid of Effective Date, and Creditor Trust Agreement, a two-member oversight committee was created, having oversight over the Creditor Trust and the Creditor Trustee with its members selected by the former Committee (the

---

[3]     Disclosure Statement, § 1, p. 1.

"**Oversight Committee**"),[4] and the Reorganized Debtors are overseen by the five-member Custom Golf Board (comprised of the members of the Oversight Committee, two of the directors that served during the Chapter 11 Cases and Jeremy Rosenthal).[5]

22.    The Plan contemplated that the Creditor Trust would make distributions to (i) the Holders of Allowed Priority Tax Claims, (ii) the Holders of Allowed General Unsecured Claims (Class 4), (iii) the Holders of Allowed Investment Claims (Class 5), and (iv) the Holders of Allowed Convertible Note Claims (Class 6). *See* Plan, Art. 5.16. However, prior to making distributions to Allowed Claims in Classes 4, 5, and 6, the Creditor Trust was required to satisfy the obligations under the Exit Facility and remaining prepetition loans secured by the golf courses. These amounts have been satisfied. *See* Plan, § 4.03; Docket No. 1086.

23.    Additionally, paragraphs 38-39 of the Confirmation Order modified the Plan as to the Holders of certain Professional Fee Claims, providing that the Holders of Allowed Professional Fee Claims may agree in writing to be paid following the Effective Date from the Assets of the Reorganized Debtors and/or Creditor Trust, prior to the payment of other Allowed Claims which otherwise would be entitled to a distribution from the Creditor Trust. The modifications contained in paragraphs 38-39 of the Confirmation Order were necessitated by an anticipated lack of available liquidity as of the Effective Date due to the difficult market for selling and operating golf courses resulting from the COVID 19 pandemic and the significant operating losses incurred by the custom golf club manufacturing business in light of the pandemic. As a result, the Confirmation Order also required the Creditor Trust to satisfy

---

[4]    *See* Plan, § 1.02(114); Order in Aid of Effective Date, p. 3.

[5]    *See* Plan, at § 5.20; Order in Aid, ¶ 7, and Plan Supplement, Ex. E.

Allowed Professional Fee Claims prior to making distributions to other Allowed Claims in Classes 4, 5, and 6.

24.     Under Article 1.02(30) of the Plan, the deadline for the Creditor Trust to object to Claims (the "**Claim Objection Deadline**") was initially December 3, 2020. The Creditor Trust sought, and the Court granted, multiple extensions of the Claim Objection Deadline ultimately to May 26, 2023. *See* Docket Nos. 1157, 1174, 1182, 1187, and 1195. Following the liquidation of the Trust Assets, and the repayment of the Exit Facility and the secured claims encumbering the golf courses, there were insufficient funds to satisfy the remaining Allowed Professional Fee claims. The Creditor Trustee determined to forego the costs associated with seeking a further extension of the Claim Objection Deadline because it was highly unlikely that any distributions to Creditor Trust Beneficiaries in Classes 4, 5, and 6 would occur.

**C.      The Creditor Trustee's Post-Effective Actions**

25.     Since the Effective Date, the Creditor Trustee and its advisors have been working diligently to pursue various avenues of recovery for the benefit of the Creditor Trust Beneficiaries through the liquidation of the Trust Assets, including (i) pursuing the sale of the Remaining Property, (ii) recovering on the Assigned Estate Claims, and (iii) operating and ultimately winding-down the custom golf club manufacturing business and the Custom Golf Interests (*i.e.* the equity interests in Reorganized Debtor WCG, the operator of the Debtors' custom golf equipment manufacturing business). However, due to adverse economic and regulatory headwinds as a result of the COVID 19 pandemic, poor demand for WCG's products, and limited operating capital, WCG was forced to cease operations, sell its remaining assets, and wind down its operations. Finally, numerous administrative and other matters required resolution by the Creditor Trust. The foregoing matters are discussed in greater detail below and set forth in the Draft Final Accounting and Budget attached hereto as **Exhibit A**.

### i.      *Sales of the Remaining Property*

26.      As described above, one of the purposes of the Creditor Trust is to maximize the value of, and monetize, the Remaining Property. Following the Effective Date, the Creditor Trustee, with the continued governance of the Oversight Committee and Custom Golf Board, diligently pursued the sale, liquidation and other disposition of the Remaining Property. In this regard, the Creditor Trust continued the substantial efforts by the Debtors prior to the Effective Date to market the remaining golf courses and other real estate.

27.      Significant post-Effective Date sales of the remaining golf courses and related properties included, Cimmaron Golf Resort (sale closing date of February 23, 2022, with a sales price of $3,900,000), Wolf Creek (sale closing July 19, 2021, with a sales price of $1,425,000) Royal St. Augustine Golf and Country Club (sale closing date of October 31, 2020, with a sales price of $1,300,000), Ole Still Golf Club (sale closing date of November 6, 2020, with a sales price of $400,000), and the rural, unentitled and undeveloped property in Riverside County, California initially intended by the Debtors and their former management to be developed into an ATV themed golf course (sale closing date of February 23, 2022, with a sales price of $550,000).[6] Additionally, the Creditor Trust was able to negotiate the condemnation of a portion of the Cimmaron land for gross proceeds of $1,139,017 and sell the land under a cell tower on the site for $205,000 as well as negotiate the discounted payoff of $125,000 of a secured promissory note related to the Nocona Hills Country Club.[7]

---

[6]      The amounts indicated above are the gross proceeds from the sale of the Remaining Property. The Reorganized Debtors received the net proceeds after repayment of any secured debt, property taxes, brokerage commissions and other transactional costs and deductions.

[7]      *See* Docket Nos. 1164 and 1169.

28.     The Creditor Trust also successfully negotiated the liquidation of the domestic Custom Golf inventory and intellectual property for $345,000 on September 20, 2021, and the international inventory held by manufacturers in China for $22,125 on November 11, 2021. Since the Effective Date, the Creditor Trust has also caused the sale or other disposition of other portions of the Remaining Property as more fully set forth in the Draft Final Accounting and Budget, with the final sale of the Remaining Property closing on April 4, 2024. In the aggregate, the Creditor Trust successfully liquidated or otherwise monetized the Remaining Property, generating gross proceeds of approximately $10,516,766.

29.     Furthermore, on the Effective Date, pursuant to the Plan and Confirmation Order, the Debtors converted their existing DIP Facility into the Exit Facility. *See* Docket No. 1086. As of the Effective Date, approximately $1,126,000 was outstanding under the Exit Facility. The proceeds from the sales of the Remaining Assets ultimately satisfied the obligations under the Exit Facility, which obligations became fully satisfied on February 23, 2022, with the sale of the Cimmaron Golf Resort. *See* Plan, at Art. 4.03; Confirmation Order, at ¶ 41; Docket No. 842.

### ii.     *The Conclusion of the Custom Golf Equipment Business and Warrior Custom Golf, Inc.*

30.     The Debtors' golf equipment and sales business was founded in 1998 and primarily operated through Debtor WCG. Prepetition, the golf equipment business utilized direct-to-consumer marketing strategies though television ads and mailers often offering to provide free golf balls or other *de minimis* equipment to attract potential new customers to a boiler-room type call center where they would be sold custom golf clubs on a "no risk" basis. By offering money back guarantees on its custom golf clubs and other items the Debtors manufactured and sold golf clubs to customers but also incurred significant obligations to refund the full purchase price to the customer upon return of the custom made and now used golf clubs.

4868-7131-2577.7 75805.001                                          13

The Debtors' call center sales team was incentivized to sell as many custom clubs as possible regardless of the return rates and their sales commissions were not adjusted to account for returns of unwanted or excess equipment pushed onto customers. These practices generated substantial amounts of returned and difficult to sell customized and used inventory, artificially high sales commissions, and significant shipping charges. Once these sale practices were curtailed, sales declined, and net profit was insufficient to sustain operations.

31.     While initially focused on selling golf clubs, as the prepetition Debtors shifted their focus to raising investments through the sale of unregistered securities, the role of the golf equipment business also evolved. Over time, the prepetition Debtors used the sale of golf equipment to generate leads for the Debtors' pre-petition securities salesmen. The shifting priorities with respect to the golf equipment business, the Debtors' poor prepetition management and recordkeeping, and the Debtors' refund policies, obscured the extent of the challenges with the Debtors' prepetition business model.

32.     Following the Effective Date and consistent with the Plan, the Creditor Trustee worked to revive the Debtors' previously profitable custom golf equipment business, including by ordering inventory, renewing marketing efforts, updating sales tactics and improving employment practices and conditions. However, the COVID 19 pandemic had a disproportionately adverse impact on WCG's historical customer base who were purchasing equipment at the lower end of the custom golf club market. Additionally, WCG was directly impacted by California and local government-imposed shutdowns of manufacturing activities and work from home requirements during the initial phases of the pandemic.

33.     Given the challenges with WCG's post-petition and ultimately post-Effective Date operations and the losses in connection therewith, the Creditor Trust, subject to the

oversight of the Oversight Committee and Custom Golf Board, determined that WCG's continued operation was not likely to maximize the value of the Creditor Trust or be in the best interest of the Creditor Trust Beneficiaries. Accordingly, the Creditor Trust wound down WCG's operations, sold the remaining assets of WCG, and settled all its outstanding post-Effective Date liabilities, as described above. As of the date hereof, the only remaining step in the wind down of WCG is its dissolution under state law.

### iii. The Creditor Trust's Post-Effective Date Litigation and Monetization of the Assigned Estate Claims

34.     Following the Effective Date, the Creditor Trust accessed a portion of its limited resources to continue to investigate and analyze causes of action against, *inter alia*, the Debtors' former officers and directors and other parties (*i.e.* the Assigned Estate Claims) that could result in the receipt of value to the Creditor Trust for the benefit of the Creditor Trust Beneficiaries. Following the Effective Date, the Creditor Trust contacted and considered numerous contingency litigation law firms to pursue such claims and causes of actions, and ultimately retained Walston PC. *See* Docket No. 1153. After its retention, Walston PC began to analyze and prepare to litigate the Assigned Estate Claims.

35.     The result of these efforts culminated in the filing, on March 3, 2021, of a complaint (the "**Complaint**") in the Bankruptcy Court against Mr. Flaherty and various other defendants including the Debtors' former prepetition directors and officers and certain entities controlled by them, commencing the adversary proceeding captioned *Force 10 Agency Services, LLC, Trustee of the Creditor Trust v. Brendan M. Flaherty, et al.* [Adv. No. 4:21-ap-03035] (the "**Adversary Proceeding**").

36.     In the Complaint, which included factual allegations that spanned a period going back almost 20 years, the Creditor Trustee asserted various claims for relief against the Debtors'

founder, Brendan M. Flaherty, and various entities owned and/or controlled by Mr. Flaherty, including breach of the fiduciary duty of loyalty, breach of the fiduciary duty of care, negligence, gross negligence, conversion, and a request for a declaratory judgment regarding ownership of certain gold and silver coins that had been seized by the Federal Bureau of Investigation pursuant to other proceedings (the "**Gold**").

37.     Mr. Flaherty filed an answer to the Complaint denying any wrong-doing or liability to the Creditor Trust. In addition, both Mr. Flaherty and the Trustee asserted competing claims over ownership of the Gold, which was in the possession of the Creditor Trust pursuant to a previous Order of the Court. The estimated value of the 292 ounces of Gold as of January 23, 2023, was approximately $565,000 (at then-current spot prices), and the Gold was ultimately sold on April 20, 2023, for $599,700.

38.     Similarly, both Mr. Flaherty and the Creditor Trustee asserted competing claims over entitlement to certain funds deposited into the registry of the Bankruptcy Court by Ryan Rodney and/or Riverbound Storage Management, LLC, former defendants in the Adversary Proceeding, on or about April 22, 2022, in the amount of $450,000.

39.     In connection with the Adversary Proceeding, the Trustee conducted asset searches of Mr. Flaherty, including retaining professionals to search for Mr. Flaherty's assets and liabilities, investigating the digital records seized by the FBI for corroborating or conflicting information (including reviewing balance sheets purporting to be of Mr. Flaherty contained therein), comparing the invoices for purchased gold with the Gold seized by the FBI, and reviewing the inventory of items seized by the FBI from Mr. Flaherty's home as part of the FBI's search for Debtors' assets. The results of these efforts revealed that Mr. Flaherty had very few, if any, assets that would be non-exempt and subject to execution to satisfy any judgment other than

the Gold (which the Debtors asserted was not Mr. Flaherty's property) and the interpleaded funds.

40.     In addition, the issues involved in the Adversary Proceeding were highly complex and would be expensive to litigate, involving a large number of documents and witnesses and covering decades of complex events.

41.     Therefore, the parties entered into a Settlement Agreement resolving the disputes between Mr. Flaherty and the Creditor Trust in all capacities, which was approved by the Court pursuant to the *Order Approving Compromise* entered on May 30, 2023 [Docket No. 1201].

42.     Under the terms of the Settlement Agreement, *inter alia*, the Creditor Trustee was authorized to sell the Gold for the benefit of the Creditor Trust; the funds in the registry of the Court were distributed to the Creditor Trust; and the Creditor Trustee distributed to Mr. Flaherty the sum of $75,000.

43.     Additionally, a settlement was reached with defendants, Reed A. Coley and ColeyDocter, Inc. (collectively the "**Coley Defendants**"), who were the Debtors' former accountants, whereby the Coley Defendants would pay the Creditor Trust $7,500 and pursuant to a *Joint Stipulation of Dismissal with Prejudice* entered in the Adversary Proceeding on May 2, 2024 (the "**Joint Stipulation**") the Coley Defendants were dismissed from the Adversary Proceeding.

44.     A remaining defendant, Dwight Beckstrand (d/b/a Beckstrand Law Offices), the former attorney for the Debtors, had filed a personal chapter 7 bankruptcy case and received a discharge on April, 13, 2020, therefore, he was also dismissed from the Adversary Proceeding pursuant to the Joint Stipulation because the Creditor Trustee determined that any damage award

was likely unrecoverable and that it would not be an efficient use of estate resources to pursue any further claims against him.[8]

### iv. Other Post-Effective Date Activities by Creditor Trustee

45.     In addition to its efforts described above, the Creditor trust worked following the Effective Date resolving and otherwise addressing a variety of administrative issues, including tax and financing related issues, in order to maximize the value of the Reorganized Debtors and prepare them for their eventual wind down.

46.     For example, after a long administrative process, including an appeal of a denial of forgiveness, on October 11, 2023, the Creditor Trustee was able to obtain forgiveness of a Paycheck Protection Program loan (the "**PPP Loan**") of $909,963.32 borrowed by Debtor Warrior Acquisitions LLC during the uncertainties of the COVID 19 Pandemic. Separately, the Creditor Trustee was able to obtain forgiveness of another PPP loan in the amount of $910,577.29 awarded to Debtor WCG.

47.     The Creditor Trustee and its professionals also spent a considerable amount of time negotiating with the Internal Revenue Service for a forgiveness or reduction in penalties and interest under the Affordable Care Act based on claims that the Debtors did not give proper notice to employees of their coverage with 1095C forms. However, ultimately, the IRS was not willing to resolve these issues, and the Creditor Trust was required to pay the full amount of approximately $220,000. Additionally, the Creditor Trust also resolved certain priority tax claims with the IRS to unlock an outstanding tax refund, netting the Creditor Trust $195,088.34, as approved by the Court. *See* Docket No. 1189.

---

[8]     Mr. Beckstrand (listing his law firm as "DBA Beckstrand Law Offices") filed a personal chapter 7 bankruptcy on November 13, 2019 (C.D. Cal. 19−bk−11883−MB, Doc. 1), and received a discharge on April 13, 2020 (C.D. Cal. 19−bk−11883−MB, Doc. 42). The chapter 7 case was closed without any distributions on November 18, 2021 (C.D. Cal. 19−bk−11883−MB, Doc. 53).

48. Additional time was spent addressing a variety of other issues such as attempting to recover on various claims for escheated assets owed to the Debtors that were being held by the California Secretary of State and other businesses, including American Express. Finally, the Trust sold its remnant assets to Oak Point Partners LLC for $6,000 on April 22, 2024, and on August 12, 2024, received the return of $40,000 from American Express.

**D.     The Remaining Creditor Trust Assets and Final Amounts**

49. As of the date hereof, the only assets remaining in the Creditor Trust are $80,713.78 held by the Trustee on behalf of the Creditor Trust, as well as the valueless equity interests in the remnant Lead Debtor and the Reorganized Debtors. As set forth in the Draft Final Accounting and Budget, the Creditor Trust believes it has sufficient resources to satisfy outstanding and anticipated post Effective-Date obligations in connection with the wind down of the Creditor Trust, Reorganized Debtors, and Lead Debtor, and the payment of any remaining fees to the U.S. Trustee, as more fully set forth therein (collectively, the "**Trust Expenses**").

50. Following payment of the Trust Expenses, the Creditor Trust expects to hold approximately $33,424 for distribution (the "**Final Distributable Amount**") to the remaining Holders of Allowed Professional Fee Claims, subject to approval of this Court. The Creditor Trust will distribute the Final Distributable Amount as follows (i) the compromised final distribution amount agreed to by the applicable Holders of Allowed Professional Fee Claims,[9] or (ii) absent an agreement, the ratable amount that would result in the Holder of an Allowed Professional Fee Claim receiving a ratable percentage equal to the highest recovery percentage of any other Holder of an Allowed Professional Fee Claim (collectively, the "**Remaining**

---

[9]     ArentFox and Cozen O'Connor have agreed to compromise the amount they would otherwise receive on account of their Remaining Professional Fee Claims (as defined below). The amount they agreed to receive in compromise of their Remaining Professional Fee Claims is scheduled in the immediately following chart.

**Professional Fee Claims**"). The Final Distributable Amount, together with the Trust Expenses, is referred to herein as the "**Final Amounts**". The Remaining Professional Fee Claims, the anticipated payment on the Remaining Fee Claims, and the resulting recovery percentages for Holders of Remaining Professional Fee Claims are:[10]

| Professional | Allowed Professional Fee Claim | Payments To Date | Remaining Professional Fee Claim | Compromised Final Recovery | Anticipated Payment on Remaining Professional Fee Claims | Recovery Percentage |
|---|---|---|---|---|---|---|
| ArentFox Schiff (DIP Lender Counsel) | $ 228,464.22 | $ (154,802) | $ 73,663 | $ (2,172) | $ (2,172) | **68.708%** |
| Cozen O'Connor (Committee Counsel) | $ 1,048,441.81 | $ (695,366) | $ 353,076 | $ (25,000) | $ (25,000) | **68.708%** |
| Force 10 (Debtor CRO and FA) | $ 6,044,723.78 | $ (4,342,356) | $ 1,702,368 | $ - | $ - | **71.837%** |
| Silver Sygnet (Committee FA) | $ 224,862.90 | $ (155,283) | $ 69,580 | $ - | $ (6,252) | **71.837%** |
| | $ 7,546,493 | $ (5,347,807) | $ 2,198,686 | $ (27,172) | $ (33,424) | |

51.     After making a final distribution on account of the Remaining Professional Fee Claims, the Creditor Trust anticipates it will be ready to cease further activities and implement its wind down.  To the extent that the Trust holds any cash after the payment of the Final Amounts, it shall use those funds to pay Cozen O'Connor's Remaining Professional Fee Claims until they reach the same recovery percentage as the other professionals, and then to make ratable distributions on the Remaining Professional Fee Claims.

**BASIS FOR RELIEF**

**A.     Termination of Creditor Trust, Wind Down of the Reorganized Debtors and Lead Debtor, Payment of the Final Amounts, and Discharge of the Creditor Trustee, Oversight Committee, and Related Persons and Entities**

52.     Section 5.15(2) of the Plan provides that,

> . . . The Plan and Creditor Trust Agreement shall govern the management and administration of the Creditor Trust and the respective rights, powers, and obligations of the Creditor Trustee and the Creditor Trust Beneficiaries, including the Creditor Trustee's power to take the reasonable actions necessary or

---

[10]   For the avoidance of doubt, ArentFox Schiff LLP was counsel to the Lender under the DIP Facility and Exit Facility. While ArentFox does not hold a "Professional Fee Claim" as that term is defined in the Plan, ArentFox nonetheless agreed to defer its payments under the Exit Facility consistent with other Holders of Professional Fee Claims. Accordingly, ArentFox's outstanding claims for fees under the DIP and Exit Facilities have been included with other Professional Fee Claims for the purposes of discussion herein.

appropriate to fulfill the purpose of the Plan, including . . . (b) retaining and paying professionals as necessary to fulfill its duties under the Plan; . . . (f) winding up the affairs of the Creditor Trust and dissolving it under applicable law; and (g) such other responsibilities as may be vested in the Creditor Trustee pursuant to the Plan, the Creditor Trust Agreement or a Bankruptcy Court order as may be necessary and proper to carry out the provisions of the Creditor Trust Agreement, but only to the extent consistent with this Plan. . . .

53.     Article XI of the Creditor Trust Agreement governs the termination of the Creditor Trust and provides, in turn,

> Section 11.1 <u>Termination of Creditor Trust</u>. The Creditor Trustee shall be discharged and the Creditor Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Assets have been liquidated, (iii) all duties and obligations of the Creditor Trustee under the Creditor Trust Agreement have been fulfilled, (iv) all distributions required to be made under this Plan and the Creditor Trust Agreement have been made, and (v) the Debtors' Chapter 11 Cases have been closed.

> Section 11.2 <u>Events Upon Termination</u>. At the conclusion of the term of the Creditor Trust, the Creditor Trustee shall distribute the remaining Creditor Trust Assets (subject to a reserve for expenses incurred in winding up the affairs of the Creditor Trust), if any, to the Beneficiaries, in accordance with the Plan, the Confirmation Order, and this Creditor Trust Agreement.

> Section 11.3 <u>Winding Up, Discharge, and Release of the Creditor Trustee</u>. For the purposes of winding up the affairs of the Creditor Trust at the conclusion of its term, the Creditor Trustee shall continue to act as Creditor Trustee until its duties under this Creditor Trust Agreement have been fully discharged or its role as Creditor Trustee is otherwise terminated under this Creditor Trust Agreement and the Plan. Upon a motion by the Creditor Trustee, the Bankruptcy Court may enter an order relieving the Creditor Trustee, its agents and employees of any further duties, discharging, and releasing the Creditor Trustee and its bond, if any.

54.     All the conditions required by section 11.1 of the Creditor Trust Agreement have been completed or will be completed as set forth in the Proposed Order. Here, all Disputed Claims have been resolved through the passage of the Claim Objection Deadline. Additionally, as set forth above, all Trust Assets have been liquidated and administered, and the Creditor Trustee seeks authority by this Motion to pay the Final Amounts, thereby completing all distributions from the Creditor Trust. Additionally, other than the relief sought by this Motion

4868-7131-2577.7 75805.001                              21

and certain limited administrative steps required to effectuate such relief, the Creditor Trustee believes that it has fulfilled all obligations under the Plan, Confirmation Order, and Creditor Trust Agreement. Moreover, there would be no further purpose in continuing the Creditor Trust, Reorganized Debtors, or Lead Debtor as set forth above. Accordingly, the Creditor Trust should be terminated and the Creditor Trust and its agents should be discharged and released from their duties under the Plan Documents, other than the filing of the Final Accounting pursuant to the Creditor Trust Agreement (discussed below) and any other administrative actions required to complete the winding down of the Creditor Trust, Reorganized Debtors, and Lead Debtor, such as completing filings with the relevant secretaries of state and any tax filings, as well as filing any final U.S. Trustee reporting and making any associated payments in connection therewith.

55.     As part and parcel of the termination of the Creditor Trust, the Creditor Trustee seeks authorization to wind down the Reorganized Debtors and Lead Debtor because the Trust Assets have been fully administered and such entities no longer serve any purpose. Additionally, consistent with the Plan, Confirmation Order, and Creditor Trust Agreement, the Creditor Trust seeks to discharge the Oversight Committee and Custom Golf Board of their obligations under the Plan, Confirmation Order, and Creditor Trust Agreement. The Creditor Trust Agreement provides that "[u]nless earlier dissolved, the Oversight Committee shall be dissolved on the date the Chapter 11 Cases are closed." Creditor Trust Agreement, at § 3.1. As with the Creditor Trustee and other agents of the Creditor Trust, upon the termination of Creditor Trustee and the closure of the Remaining Cases and Lead Case, the Custom Golf Board and Oversight Committee have no further role with respect to these Chapter 11 Cases.

## B.   Final Accounting and Destruction of Corporate Records

56.   Sections 6.5 and 6.6 of the Creditor Trust Agreement require a final accounting (the "**Final Accounting**") to be filed with the Court by the Creditor Trustee within thirty days after the termination of the Creditor Trust, which accounting shall contain the following information:

(a) A description of the Creditor Trust Assets;

(b) A summarized accounting in sufficient detail of all gains, losses, receipts, disbursements and other transactions in connection with the Creditor Trust and the Creditor Trust Assets during the Creditor Trustee's term of service, including their source and nature;

(c) Separate entries for all receipts of principal and income;

(d) The ending balance of all Creditor Trust Assets as of the date of the accounting, including the Cash balance on hand and the name(s) and location(s) of the depository or depositories where the Cash is kept;

(e) All known liabilities of the Creditor Trust; and

(f) All pending actions.

57.   Attached hereto as **Exhibit A** is a draft of the Final Accounting inclusive of a budget (the "**Draft Final Accounting and Budget**") with respect to the final actions required to conclude these chapter 11 cases and wind down the Creditor Trust as well as the Reorganized Debtors and Lead Debtor. The Creditor Trustee proposes to file the Final Accounting substantially in the form of the Draft Final Accounting and Budget. In accordance with the Creditor Trust Agreement, the Creditor Trustee will file the Final Accounting within 30 days after closing the Creditor Trust and the wind down of the Reorganized Debtors and Lead Debtor once all final amounts and payments have been finally determined.

58.   Additionally, section 6.3(c) of the Creditor Trust Agreement provides that the books and records maintained by the Creditor Trustee "may be disposed of by the Creditor

Trustee at the later of (i) such time as the Creditor Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Creditor Trust or its Beneficiaries or (ii) upon the termination and completion of the winding down of the Creditor Trust." Consistent with the Creditor Trust Agreement, the Creditor Trustee seeks authority to dispose of the books and records maintained by the Creditor Trust 14 days following the filing of the Final Accounting.

## C.      Final Decree

59.      As described above, the Court's Decree Closing Certain Affiliate Cases was entered by this Court closing the Affiliate Cases and leaving open (pending further order of the Court) the Lead Case and the Reorganized Debtor Cases. Bankruptcy Code section 350(a) provides that the Bankruptcy Court shall close a case after the estate has been fully administered. 11 U.S.C. § 350(a). In addition, Rule 3022 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") provides that, "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case." Fed. R. Bankr. P. 3022. Furthermore, section 105 of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

60.      There is no definition of "fully administered" in the Bankruptcy Code or the Bankruptcy Rules. However, the non-exclusive list of factors set forth in the Advisory Committee Note to Fed. R. Bankr. P. 3022 provides some guidance for this Court. *See Spierer v. Federated Dep't Stores, Inc. (In re Federated Dep't Stores, Inc.)*, No. 01-4242, 2002 U.S. App. LEXIS 16059, at *5–8 (6th Cir. Aug. 5, 2002); *Shotkoski v. Fokkena (In re Shotkoski)*, 420 B.R.

4868-7131-2577.7 75805.001                                        24

479, 483 (B.A.P. 8th Cir. 2009); *In re Union Home & Indust., Inc.*, 375 B.R. 912, 916–917 (B.A.P. 10th Cir. 2007) (noting that the court also must consider case specific, procedural, and practical factors in the exercise of its discretion under Fed. R. Bankr. P. 3022); *Weaver v. Tex. Capital Bank (In re SL Mgmt., LLC)*, No. 09-04254, 2010 Bankr. LEXIS 1074, at \*10–11 (Bankr. N.D. Tex. Mar. 30, 2010) (noting that the Advisory Committee Note does not require that all claims be paid before a case is considered "fully administered").

61.     The Advisory Committee Note to Bankruptcy Rule 3022 lists certain factors that may—among other case-specific and practical factors to be considered by this Court in its discretion—be helpful to determine whether a case has been fully administered, including whether the order confirming the plan has become final; whether the debtor has assumed the business addressed by the plan of reorganization; and whether payments under the plan of reorganization have commenced. *See* Fed. R. Bankr. P. 3022, Advisory Committee Notes (1991).

62.     Importantly, Bankruptcy Rule 3022 is intended to allow courts a flexible standard for determining whether an estate is fully administered, and the determination is based on a "case-by-case basis . . . [and] not all the factors set forth in the Advisory Committee Note need to be present to establish that a case is fully administered for final decree purposes." *Spierer*, 2002 U.S. App. LEXIS 16059 at \*7; *see also In re Union Home & Indust.*, 375 B.R. at 917 ("The factors listed in the Advisory [Committee] Note are not considered exhaustive, nor must a party demonstrate all of the factors, before the court may find a case to be fully administered."). Furthermore, the mere possibility that the court's jurisdiction may be invoked in the future does not mean that the court should keep the case open. *Spierer*, 2002 U.S. App. LEXIS 16059 at \*7 (quoting the Advisory Committee Note).

63.     Here, the bankruptcy estates of the remaining Lead Case and Reorganized Debtor Cases have been fully administered, the Creditor Trustee has completed its work in administering the Creditor Trust Assets, and no purpose would be served in keeping the remaining cases open any longer. The Plan has been substantially consummated within the meaning of section 1101(2) of the Bankruptcy Code. *See* Confirmation Order, at ¶ 31 (providing for substantial consummation as of the Effective Date). The Confirmation Order has become final, and, upon completion of the final Creditor Trust tasks and payment of Creditor Trust Expenses, the Creditor Trustee will have fulfilled all of its obligations under the Creditor Trust Agreement. The Creditor Trustee has also completed its work to the extent set forth herein and will be prepared for the entry of the Final Decree in the remaining Lead Case and Reorganized Debtor Cases.

64.     Therefore, the Creditor Trust requests that this Court enter a final decree closing the Lead Case and the Reorganized Debtor Cases.

## NOTICE

65.     Notice of this Motion has been given to all parties on the Master Service List established in these Chapter 11 Cases, on all known Creditor Trust Beneficiaries, and the Holders of the Remaining Professional Fee Claims. The Creditor Trustee respectfully submits that such notice is sufficient and proper under the circumstances and that no other or further notice is required.  Additionally, given the relative costs and limited remaining resources of the Creditor Trust, the Creditor Trustee requests to forego service of any order granting this Motion, except on parties who timely respond to this Motion.

## CONCLUSION

**WHEREFORE**, based upon the foregoing, the Creditor Trustee respectfully requests that the Court enter an order, substantially in the form of the Proposed Order attached hereto, granting the motion and grant such other and further relief as the Court deems just and proper under the circumstances.

Dated:  May 1, 2026                                    Respectfully submitted,

                                    By:     */s/ Michael D. Warner*
                                            Michael D. Warner (TX Bar No. 00792304)
                                            Benjamin L. Wallen (TX Bar No. 24102623)
                                            **PACHULSKI STANG ZIEHL & JONES LLP**
                                            700 Louisiana Street, Suite 4500
                                            Houston, TX 77002
                                            (713) 691-9385
                                            (713) 691-9407 (fax)
                                            mwarner@pszjlaw.com
                                            bwallen@pszjlaw.com

                                            *Counsel for the Creditor Trust*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2026, a true and correct copy of the above and foregoing has been served by electronic transmission to all registered CM/ECF users appearing in these cases.

                                            */s/ Michael D. Warner*_____
                                            Michael D. Warner